1
 2025 CO 6 Adam Douglas Densmore, Petitioner: v. The People of the State of Colorado. Respondent: No. 23SC81
Supreme Court of Colorado, En Banc
February 10, 2025
 
          The
 supreme court granted certiorari to consider whether
 Miranda v. Arizona, 384 U.S. 436 (1966), applies
 when a Department of Human Services caseworker conducts a
 custodial interrogation.
 
 
          The
 court concludes that, in determining whether a caseworker
 acted as an agent of law enforcement in interviewing a person
 who was in custody, such that Miranda warnings were
 required, courts must consider the totality of the
 circumstances, including both objective and subjective
 factors. Applying that standard to the facts presented, the
 court further concludes that the caseworker who interviewed
 Petitioner did not act as an agent of law enforcement when
 she spoke with him and, therefore, she was not required to
 provide Miranda warnings before conducting the
 interviews.
 
 
          Accordingly,
 the court affirms the judgment of the court of appeals
 division below.
 
 
          
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 18CA1304
 
 
          
 Attorneys for Petitioner: Megan A. Ring, Public Defender
 Chelsea E. Mowrer, Deputy Public Defender Denver, Colorado.
 
 
          
 Attorneys for Respondent: Philip J. Weiser, Attorney General
 Grant R. Fevurly, Senior Assistant Attorney General Denver,
 Colorado.
 
 
          
 Attorneys for Amici Curiae ACLU of Colorado and Office of
 Respondent Parents' Counsel: Timothy R. Macdonald Sara
 Neel Emma Mclean-Riggs Laura Moraff Denver, Colorado Zaven T.
 Saroyan Denver, Colorado.
 
 
          
 Attorneys for Amicus Curiae Colorado Department of Human
 Services: Philip J. Weiser, Attorney General Nicole Chaney,
 Assistant Attorney General Denver, Colorado.
 
 
          
 Attorneys for Amici Curiae Denver Department of Human
 Services and Arapahoe County Department of Human Services:
 Amy J. Packer, Assistant City Attorney Denver, Colorado
 Jordan Lewis, Assistant County Attorney Aurora, Colorado.
 
 
          
 Attorneys for Amici Curiae Office of Alternate Defense
 Counsel and Colorado Criminal Defense Bar: Spencer Fane LLP
 Dean Neuwirth Denver, Colorado.
 
 2
 
          
 JUSTICE GABRIEL delivered the Opinion of the Court, in which
 CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE HOOD,
 JUSTICE HART, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER
 joined.
 
 
          
 OPINION
 
 
          
 GABRIEL JUSTICE.
 
 3
 
          ¶1
 We granted certiorari to consider whether Miranda v.
 Arizona, 384 U.S. 436 (1966), applies when a Department
 of Human Services caseworker conducts a custodial
 interrogation. Adam Douglas Densmore urges us to adopt a
 bright-line rule that whenever a caseworker conducts a
 custodial interrogation that involves current or unsolved
 allegations that a reasonable caseworker should know are
 criminal, Miranda applies. Alternatively, he asks us
 to adopt an objective totality of the circumstances test that
 does not consider subjective intent.
 
 
          ¶2
 We decline both invitations and instead conclude that, in
 determining whether a caseworker acted as an agent of law
 enforcement in interviewing a person who was in custody, such
 that Miranda warnings were required, courts must
 consider the totality of the circumstances, including both
 objective and subjective factors. Applying that standard to
 the facts presented here, we further conclude that the
 caseworker who interviewed Densmore did not act as an agent
 of law enforcement when she spoke with him and, therefore,
 she was not required to provide Miranda warnings
 before conducting the interviews.
 
 
          ¶3
 Accordingly, we affirm the judgment of the court of appeals
 division below.
 
 4
 
          I.
 Facts and Procedural History
 
 
          ¶4
 In February 2017, Densmore lived in Boulder with his
 thirteen-month-old child and the child's mother, Ashley
 Mead. After Mead did not arrive for work one day, her
 employer called the police.
 
 
          ¶5
 At this time, Densmore and the child were in Oklahoma, where
 Densmore was arrested by Oklahoma law enforcement officers.
 Because Densmore had the child with him when he was arrested
 and the child had no other adult caregivers, the police
 called the Oklahoma Department of Human Services (the
 "Department") and asked the Department to take
 custody of the child. At that point, Jessica Punches, then a
 child welfare specialist in the Department's Child
 Welfare Division, got involved in this matter.
 
 
          ¶6
 Punches was not a law enforcement officer, and her job
 description did not include any specific law enforcement
 activities or criminal investigations. Rather, her job
 involved investigating the safety of children and reporting
 information that could endanger a child's welfare.
 
 
          ¶7
 In performing these duties, Punches frequently interviewed
 people who were incarcerated. When she conducted such
 interviews, her purpose was to determine what brought a child
 to the Department's attention and the steps necessary to
 maintain the child's safety. Thus, when interviewing
 someone who was incarcerated, she asked questions concerning
 substance abuse, domestic
 
 5
 
 violence, family support, discipline, parenting styles, child
 placement options, and services that the incarcerated parent
 might need. Ultimately, Punches sought to determine the least
 restrictive placement for the child, prioritizing placing the
 child with a family member, if possible, rather than in
 foster care.
 
 
          ¶8
 Consistent with the foregoing, Punches took custody of
 Densmore's child, brought the child to her office, and
 began seeking an appropriate placement. She also spoke with a
 detective from the Boulder Police Department. At that point,
 the detective informed Punches that Densmore was being held
 on a suspected custody violation, Mead's whereabouts were
 unknown, and it was unclear whether Mead was alive.
 
 
          ¶9
 Punches then interviewed Densmore at the county jail where he
 was being held. Before this interview, police had twice
 provided Densmore with Miranda warnings, and each
 time, Densmore had invoked his right to an attorney. It
 appears undisputed that Punches did not provide Densmore with
 Miranda warnings before beginning her interview. It
 likewise appears undisputed that no law enforcement officer
 had asked Punches to interview Densmore and that Punches did
 not offer to interview Densmore on behalf of any law
 enforcement officers. Rather, consistent with her usual
 practice as a child welfare specialist, her intent was to
 ascertain information to ensure the safety and appropriate
 placement of the child.
 
 6
 
          ¶10
 Punches questioned Densmore regarding the child's
 allergies, her likes and dislikes, how to comfort her, how
 she was disciplined, parenting techniques, substance abuse,
 domestic violence, and support systems for the family.
 Punches also asked Densmore how he ended up in the county
 where he was arrested and about his travel plans. She asked
 these questions to try to establish a timeline of what had
 happened for purposes of her investigation. She further asked
 Densmore if he knew where Mead was. She did so because if a
 parent is available, then she would want to place the child
 with that parent. She also inquired about other family
 members who could possibly take custody of the child.
 
 
          ¶11
 In the course of this conversation, Punches asked Densmore
 when he last saw Mead. He responded that it was on the
 previous Sunday, and he noted that he and Mead had gotten
 into a fight. Punches asked him to tell her about the fight
 and whether it was physical. Densmore responded that he had
 slapped Mead. Punches also asked about his relationship with
 Mead generally.
 
 
          ¶12
 Punches inquired about domestic violence in the household
 because she understood that exposure to domestic violence is
 a child safety concern. She sought information regarding
 Densmore's relationship with Mead because she generally
 wanted to know how individuals in a child's home got
 along and related to each other, to determine whether there
 was any danger to the child.
 
 7
 
          ¶13
 During Punches's interview of Densmore, a task force
 officer sat behind Punches, at her request, for her
 "safety." The officer did not ask Densmore any
 questions, instruct Punches to ask any questions, or
 participate in the interview in any way.
 
 
          ¶14
 In addition, an audio/video recording system recorded
 Punches's interview of Densmore, as well as
 Densmore's interactions with law enforcement officers
 following that interview. At the conclusion of the interview,
 it appears that both Punches and an FBI agent obtained discs
 containing the video recording. It further appears that the
 recording was subsequently shared with the Boulder Police
 Department.
 
 
          ¶15
 After Punches completed her interview of Densmore, she spoke
 with an FBI agent who told her that a torso had been found in
 a dumpster and that he believed it to be Mead's torso.
 She also spoke with a Boulder detective who informed her that
 Densmore was being held on suspicion of first degree murder.
 
 
          ¶16
 The next day, Punches spoke again with Densmore, this time by
 telephone. Two of Punches's colleagues also participated
 in this call, the purpose of which was to conduct a
 "child safety meeting." It appears undisputed that
 neither Punches nor either of her colleagues provided
 Densmore with Miranda warnings before this meeting,
 assuming that a telephonic meeting like this could even be
 characterized as a custodial interrogation. And, as with the
 prior interview, the
 
 8
 
 purpose of this meeting was not to aid in any prosecution, to
 solve any crimes, or to gather incriminating information;
 Punches did not make the call on behalf of any law
 enforcement personnel; and no law enforcement personnel
 instructed Punches to make this call. Rather, the purpose of
 the meeting was to discuss with Densmore the facts that he
 was incarcerated and Punches had not yet found another
 caregiver, Densmore's admitted substance abuse, and
 "possible fighting" between him and Mead. Punches
 also discussed with Densmore his strengths as a parent and
 the best placement plan for the child.
 
 
          ¶17
 In the course of this conversation, Punches again inquired
 whether there had been any domestic violence between Mead and
 Densmore. When Densmore responded that there had not been,
 Punches confronted him with his statement during the initial
 interview that he had slapped Mead. Punches followed up
 because, as noted above, she understood that domestic
 violence in the home was a child safety concern and also
 because she wanted her two colleagues, who had not been
 present during her initial interview, to hear the information
 that she had gathered previously.
 
 
          ¶18
 When Punches conducted an investigation like the one in this
 case, she created a report that she often (although not
 always) filed with the district attorney. She created such a
 report here and shared it with the district attorney,
 although she did not include in her report information
 regarding the child safety
 
 9
 
 meeting. She excluded that information because all parties to
 that meeting had agreed to treat the meeting as confidential.
 Thus, the child safety meeting was documented only internally
 at the Department.
 
 
          ¶19
 Several months later, a Boulder detective contacted Punches
 because the detective's copy of the recording of
 Punches's initial interview with Densmore was not working
 properly. The detective inquired whether Punches had a
 working copy and asked for information about her interview
 with Densmore. Because the Department's records are
 sealed, Punches was unsure whether it was appropriate for her
 to share this information without a court order. She
 therefore asked her supervisor. Her district director
 responded that she could share the requested information with
 law enforcement, and Punches did so.
 
 
          ¶20
 The People charged Densmore with first degree murder of Mead,
 tampering with a deceased human body, tampering with physical
 evidence, and abuse of a corpse. Densmore thereafter moved to
 suppress the statements that he had made to Punches during
 her interview of him at the jail and to suppress any
 testimony regarding the telephonic child safety meeting.
 Regarding the former, Densmore argued that (1) Punches was
 acting as an agent of the state when she interrogated
 Densmore and, thus, all of his statements should be
 suppressed because they were in violation of Miranda
 and (2) the statements were not voluntary. Regarding the
 latter, he argued, among other things, that the statements
 were not voluntary.
 
 10
 
          ¶21
 The trial court ultimately denied both of Densmore's
 motions, principally reasoning that Punches's purpose in
 interviewing Densmore was to develop a safety plan and
 placement options for the child. In support of this
 determination, the court found that it was the
 Department's regular practice to interview a child's
 biological parents when the Department took custody of the
 child and, thus, Punches had a purpose other than to aid law
 enforcement in investigating this case. Accordingly, the
 court concluded that Punches was not acting as an agent of
 law enforcement when she conducted the interview and,
 therefore, the interview did not fall within the purview of
 the Constitution. In light of this ruling, the court did not
 need to decide whether Densmore's statements were
 voluntary.
 
 
          ¶22
 As to the telephonic child safety meeting, the court
 similarly found that the meeting's purpose was to discuss
 with Densmore the Department's allegations, to obtain his
 thoughts regarding the child's placement, and to find the
 least restrictive environment for the child. The purpose of
 the meeting was not to aid law enforcement, which did not
 participate in the meeting, and, thus, Punches and her
 colleagues were not acting as agents of law enforcement
 during the meeting. As a result, the court concluded that,
 like Punches's initial interview, this meeting did not
 implicate constitutional protections, and the court again did
 not need to determine whether Densmore's statements were
 voluntary.
 
 11
 
          ¶23
 The case proceeded to a jury trial, and, at trial, the court
 admitted some of Densmore's statements to Punches. The
 jury convicted Densmore as charged, and he appealed, arguing,
 as pertinent here, that the trial court had erred in denying
 his motions to suppress his statements to Punches.
 
 
          ¶24
 In a unanimous, unpublished opinion, a division of the court
 of appeals affirmed. People v. Densmore, No.
 18CA1304, ¶ 106 (Nov. 23, 2022). In so ruling, the
 division observed that Miranda applies to a
 custodial interrogation conducted by a person other than a
 law enforcement officer when that person acts as an agent of
 law enforcement. Id. at ¶ 28. This is to
 prevent law enforcement officers from circumventing
 Miranda by directing third parties to act on their
 behalf. Id. The division then applied a totality of
 the circumstances test to determine whether Punches had acted
 as an agent of law enforcement. Id. at ¶ 31. In
 applying this test, the division considered, among other
 things, that (1) Punches was a government employee; (2) her
 job duties all related to child welfare and family
 reunification; (3) she confirmed that she was not a law
 enforcement officer and did not investigate crimes; (4) the
 fundamental purpose of her investigations was not to obtain
 incriminating information; (5) there was no evidence that the
 police directed, controlled, or participated in her
 investigation; (6) she had not consulted or coordinated with
 law enforcement personnel regarding the questions to ask
 Densmore; (7) she had had only brief contact with law
 enforcement officers before
 
 12
 
 beginning her investigation; (8) no evidence showed that she
 had reviewed any police reports or other materials related to
 the criminal investigation; (9) she had a duty to report
 information that may endanger a child's welfare; (10) she
 did not provide a report to prosecutors in every case; and
 (11) she did not have the authority to apprehend, detain, or
 handcuff individuals. Id. at ¶¶ 32-35.
 Considering these factors in their totality, the division
 concluded that Punches was not acting as an agent of law
 enforcement when she spoke with Densmore in this case.
 Id. at ¶ 36. The division thus determined that
 the trial court had correctly denied Densmore's motions
 to suppress his statements to Punches. Id. at ¶
 37.
 
 
          ¶25
 Densmore then petitioned this court for a writ of certiorari,
 and we granted his petition.
 
 
          II.
 Analysis
 
 
          ¶26
 We begin by setting forth the applicable standard of review
 and Miranda's requirements. We then address the
 law that applies when a person other than a law enforcement
 officer conducts a custodial interrogation. We end by
 applying these legal principles to the facts now before us.
 
 
          A.
 Standard of Review and Governing Miranda
 Principles
 
 
          ¶27
 Our review of a trial court's order regarding a motion to
 suppress evidence involves a mixed question of fact and law.
 People v. Cline, 2019 CO 33, ¶ 13, 439 P.3d
 1232, 1236. We defer to a trial court's factual findings
 if they are
 
 13
 
 supported by competent evidence in the record, but we review
 de novo the court's legal conclusions. Id. Our
 review of a trial court's ruling on a motion to suppress
 is limited to the record created at the suppression hearing.
 People v. Thompson, 2021 CO 15, ¶ 16, 500 P.3d
 1075, 1078.
 
 
          ¶28
 The Fifth Amendment to the United States Constitution
 protects individuals from compelled self-incrimination. U.S.
 Const. amend. V. To safeguard this right, Miranda,
 384 U.S. at 478-79, requires that when an individual is
 subjected to a custodial interrogation, the interrogator must
 advise the individual that (1) they have the right to remain
 silent; (2) anything they say can be used against them in a
 court of law; (3) they have the right to an attorney's
 presence; and (4) if they cannot afford an attorney, then one
 will be appointed for them prior to any questioning if they
 so desire. Absent an exception to this rule, unwarned
 statements made during a custodial interrogation are presumed
 to be compelled and are inadmissible in the prosecution's
 case in chief. Verigan v. People, 2018 CO 53, ¶
 19, 420 P.3d 247, 251.
 
 
          B.
 Custodial Interrogations by Non-Law Enforcement
 Officers
 
 
          ¶29
 Although Miranda typically applies to law
 enforcement officers conducting custodial interrogations, we
 have opined that it also applies to "civilians acting as
 agents of the state in order to prevent law enforcement
 officials from circumventing the Miranda
 requirements by directing a third party to act on their
 
 14
 
 behalf." People v. Robledo, 832 P.2d 249, 250
 (Colo. 1992). To determine whether a civilian is acting as an
 agent of law enforcement in conducting a custodial
 interrogation, a court must consider the totality of the
 circumstances. Id. Although our case law has not
 compiled an exhaustive list of factors that a court must
 consider, we have provided guidance.
 
 
          ¶30
 In Robledo, for example, we considered whether a
 counselor at a juvenile detention center acted as an agent of
 law enforcement in speaking with a detained juvenile.
 Id. In that context, we deemed relevant the
 counselor's duty to investigate and interview juveniles
 to determine whether they qualified for home monitoring; the
 counselor's authority to apprehend, handcuff, and detain
 juveniles under certain circumstances; his access to police
 reports and the fact that he had reviewed the incarcerated
 juvenile's police report before meeting with the
 juvenile; the counselor's duty to report information that
 he learned and that might cause or had caused bodily injury
 to another; and the fact that the counselor was under
 contract with and was paid by the state to perform these
 duties. Id. at 251. ¶31 Nothing in
 Robledo, however, suggested that these factors are
 the exclusive factors that courts are to consider in
 determining whether a civilian is acting as an agent of law
 enforcement when conducting a custodial interrogation. To the
 contrary, we emphasized that courts are to consider the
 totality of the circumstances. Id. at 250.
 Accordingly, in our view, the division below did not err
 
 15
 
 in also considering factors such as the investigator's
 job duties and the purposes of those duties; whether the
 investigator was a law enforcement officer who investigates
 crimes; whether the investigator's purpose was to obtain
 incriminating information; whether the police directed,
 controlled, or participated in her investigation or gave
 input regarding the questions the investigator should ask the
 person to be interviewed; and the extent of the
 investigator's contact with law enforcement officers
 before she began her investigation. Densmore,
 ¶¶ 32-35. All of these factors contribute to an
 assessment of the totality of the circumstances. ¶32 We
 believe-and therefore reaffirm-that the foregoing totality of
 the circumstances approach is a workable one that
 appropriately considers the facts of each particular case. We
 thus decline to adopt Densmore's proposed bright-line
 rule that whenever a caseworker conducts a custodial
 interrogation that involves current or unsolved allegations
 that a reasonable caseworker should know are criminal,
 Miranda applies. Such a rule would, as a practical
 matter, cover most child welfare interviews that caseworkers
 conduct of parents in custody, regardless of the
 circumstances of a particular case, and Densmore has offered
 no persuasive reason for extending Miranda to
 custodial interrogations conducted by people who are neither
 law enforcement officers nor agents of law enforcement.
 
 
          ¶33
 We likewise decline Densmore's invitation to limit the
 factors that a court may consider to objective ones,
 excluding subjective factors such as the intent of
 
 16
 
 the interrogator. Neither Robledo nor any other case
 of which we are aware expressly limits the agency
 determination to an assessment of objective factors, and we
 believe that such an approach would, in some cases, preclude
 consideration of relevant facts, contrary to a totality of
 the circumstances analysis. ¶34 Accordingly, we reaffirm
 the totality of the circumstances approach that we adopted
 decades ago in Robledo and decline to limit the
 factors that a court may deem relevant in a particular case.
 
 
          C.
 Application
 
 
          ¶35
 Applying the foregoing principles to the facts before us, we
 conclude that Punches was not acting as an agent of law
 enforcement when she interviewed Densmore here. To be sure,
 Punches, like the counselor in Robledo, was paid by
 the state and had duties to investigate and interview
 individuals and to report certain information that she had
 learned (albeit not necessarily for law enforcement
 purposes). Unlike in Robledo, however, no evidence
 was presented that Punches had the authority to apprehend,
 detain, or handcuff individuals. Nor did she have access to
 or review any police reports or other materials related to
 the criminal investigation involving Densmore before speaking
 with him.
 
 
          ¶36
 In addition, although the police were aware that Punches was
 interviewing Densmore, they did not direct her to do so. Nor
 did they direct or control her investigation or coordinate
 with her regarding questions that she was to ask
 
 17
 
 Densmore. And Punches did not intend through her questioning
 to assist law enforcement in investigating any crimes or to
 obtain incriminating information. Rather, her purpose was to
 gather information to ensure the child's welfare and to
 find a safe placement for the child. The fact that Punches
 sometimes shared her report with the district attorney and
 did so here did not change her role or purpose in
 interviewing Densmore. Nor did her role or purpose in
 performing her duties change when, several months after her
 initial interview and child safety meeting with Densmore, she
 shared requested information with a Boulder detective.
 
 
          ¶37
 We also note that although a task force officer was present
 during the initial interview, it appears undisputed that he
 was present at Punches's request and solely for her
 safety and that he did not participate in any way in the
 interview. And although law enforcement officers obtained the
 recording of Punches's initial interview of Densmore, the
 record does not establish that the interview was recorded to
 gather incriminating information.
 
 
          ¶38
 Considering all of these facts in their totality, we conclude
 that Punches was not acting as an agent of law enforcement
 when she interviewed Densmore and, thus, she had no
 obligation to provide Miranda warnings prior to
 conducting that interview.
 
 
          ¶39
 We are not persuaded otherwise by Densmore's reliance on
 Estelle v. Smith, 451 U.S. 454 (1981), and
 Mathis v. United States, 391 U.S. 1 (1968).
 
 18
 
          ¶40
 Estelle, 451 U.S. at 467, concerned whether the
 government could introduce, at the penalty phase of a capital
 trial, unwarned statements that an in-custody defendant had
 made to a psychiatrist during a court-ordered competency
 evaluation. There, although the psychiatrist was initially
 designated by the court to conduct a neutral competency
 evaluation, he subsequently went beyond merely reporting to
 the court on the question of the defendant's competence
 and testified for the prosecution at the penalty phase of the
 trial on the issue of the defendant's future
 dangerousness. Id. In these circumstances, the Court
 concluded that the psychiatrist's role had changed and
 that he had essentially become an agent of law enforcement.
 Id.
 
 
          ¶41
 As Densmore contends, Estelle involved statements
 made to a person other than a law enforcement officer without
 the benefit of Miranda warnings, and the same is
 true here. Unlike here, however, the psychiatrist in
 Estelle had spoken to the defendant in the context
 of, in direct connection with, and for the purpose of a
 pending criminal proceeding. Accordingly, it is not clear to
 us that Estelle is on point, as Densmore argues.
 Regardless, in the time since Estelle was decided,
 the Supreme Court has observed that its "opinion in
 Estelle suggested that [its] holding was limited to
 the 'distinct circumstances' presented there."
 Penry v. Johnson, 532 U.S. 782, 795 (2001). Indeed,
 the Court has noted that it "[has] never extended
 
 19
 
 Estelle's Fifth Amendment holding beyond its
 particular facts." Id. We therefore decline to
 apply Estelle to the very different factual setting
 now before us.
 
 
          ¶42
 In Mathis, 391 U.S. at 2-4, 3 n.2, an in-custody
 defendant had made unwarned statements to an Internal Revenue
 Service agent as part of what the Government deemed a
 "routine tax investigation." The defendant
 contended that the statements were inadmissible under
 Miranda. Id. at 3. The Government responded
 that Miranda was inapplicable because (1) the
 questions were asked as part of a "routine tax
 investigation" that might not have resulted in a
 criminal prosecution and (2) the defendant was not
 incarcerated by the agent questioning him but was imprisoned
 for a different purpose. Id. at 4.
 
 
          ¶43
 The Court agreed with the defendant, concluding that the
 distinctions between the case before it and Miranda
 were "too minor and shadowy" to justify departing
 from Miranda. Id. In support of this
 conclusion, the Court began by acknowledging that tax
 investigations could be initiated for the purpose of civil
 proceedings rather than criminal prosecutions and that, to
 this extent, tax investigations differ from investigations of
 some other crimes. Id. The Court went on to note,
 however, that tax investigations frequently lead to criminal
 prosecutions, as had occurred in the case before it.
 Id. Indeed, the full-fledged criminal investigation
 in the matter before the Court began just days after the
 agent's last visit to question the defendant.
 Id. In these circumstances, the Court
 
 20
 
 declined to conclude that tax investigations are immune from
 Miranda's requirements, as the Government there
 had argued. Id.
 
 
          ¶44
 Although we acknowledge that there are some parallels between
 the interviews at issue in Mathis and the meetings
 at issue here, we conclude that the tax investigation in
 Mathis differs in material ways from the kind of
 child welfare investigation that occurred in this case. The
 purpose of the agent's investigation in Mathis
 was to enforce federal tax laws, whether through civil or
 criminal proceedings. Id. Accordingly, the
 investigation served a predominantly law enforcement purpose.
 Here, in contrast, Punches conducted her investigation to
 determine how to care for and where to place Densmore's
 child while Densmore was in custody, Mead's whereabouts
 were unknown, and the child had no other caregivers. As a
 result, Punches's investigation was not aimed at
 uncovering violations of law, developing evidence in a
 criminal case, or enforcing criminal law, even if her
 investigation ultimately uncovered facts that subsequently
 became relevant in the criminal investigation concerning
 Densmore.
 
 
          ¶45
 Moreover, in a case like this, child welfare specialists like
 Punches serve a critical role that is entirely separate and
 distinct from any criminal proceedings, namely, ensuring
 child safety and finding an appropriate placement for a
 child. In our view, such facts make Punches's involvement
 in this case materially
 
 21
 
 different from that of the Internal Revenue Service agent in
 Mathis. Mathis is therefore distinguishable
 from the case now before us.
 
 
          III.
 Conclusion
 
 
          ¶46
 For these reasons, we conclude that when determining whether
 a Department of Human Services caseworker acted as an agent
 of law enforcement in interviewing a person who was in
 custody, such that Miranda warnings were required,
 courts must consider the totality of the circumstances,
 including both objective and subjective factors. Applying
 this approach to the facts now before us, we further conclude
 that Punches did not act as an agent of law enforcement when
 she interviewed Densmore and, therefore, she was not required
 to provide Miranda warnings before conducting the
 interviews. As a result, the division below correctly upheld
 the trial court's order denying Densmore's motions to
 suppress.
 
 
          ¶47
 Accordingly, we affirm the division's judgment.